832 So.2d 242 (2002)
S.M., Mother of A.M., A Child, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
No. 5D02-587.
District Court of Appeal of Florida, Fifth District.
December 6, 2002.
Ryan Thomas Truskoski of Ryan Thomas Truskoski, P.A., Orlando, for Appellant.
Charles D. Peters, Orlando, for Appellee.
THOMPSON, C.J.
S.M. ("the mother") appeals an order adjudicating her child, A.M. dependent. We affirm.
The father, who did not live with the mother, had custody of A.M. On 26 October 2001, the mother had a visit with the child for the first time in several months. The mother allegedly discovered bruises on A.M. The police responded to the mother's home and took photographs. The next day, the mother took A.M. to the hospital. The mother and the father, *243 among others, were interviewed, and the Department of Children and Families ("DCF") took A.M. into custody.
Kris Jackson testified that she babysat A.M. for the father from June through October. On 26 October, she babysat A.M. in her own home, the father picked up A.M. at 6:00 p.m. When shown a photograph of the bruises on A.M.'s back, Jackson testified that A.M. did not have those marks on her when the child left Jackson's house. Jackson had, however, noticed an older bruise on A.M.'s chest. Jackson testified that she babysat the child four to five days per week from June through October for the father, and she neither caused injury to A.M., nor suspected that A.M. was being abused.
The father testified that he picked up the child at 6:00 p.m. from Jackson's house, and that it took thirty to forty-five minutes to take the child home, to bathe and change her, and to pick up his wife prior to meeting the mother. He testified that the mother had previously admitted to him that her fiance, Robert Baldwin, was abusive to the mother and Baldwin did not want A.M. there. The father testified that he did not deny visitation to the mother. Rather, he attempted to drop off A.M. to the mother three times in June, and the mother refused because Baldwin did not want A.M. there.
Leteisha Graham-Tullis ("Tullis"), the father's wife, testified that, on an earlier occasion, A.M. came home from a visit with the mother with a burn on her arm and an injured lip. When Tullis and the father called the mother regarding the injuries to A.M., the mother stated that she did not know what caused them.
The mother testified that the father dropped off the child around 7:00 p.m. on 26 October 2001, and that she took A.M. directly to her house. The mother testified that she was in the front room playing with A.M. and her other children while Baldwin was in the kitchen cooking spaghetti for the children. The mother testified that she noticed bruises on A.M. as she prepared to bathe A.M. prior to eating, and she told Baldwin to call the police. The mother testified that the police told her that A.M. needed to be taken to the hospital immediately, but that she did not do so until the next day around 3:00 p.m. after taking the child to a parade. Also, the mother testified that DCF had been providing services to her family for quite some time because there had been violence in the house.
The court asked for clarification regarding the length of time it took Baldwin to cook spaghetti. The court pointed out that the mother testified that Baldwin was cooking spaghetti when she arrived at 7:30 p.m. and when he called the police at 8:20 p.m. The court pointed out that the mother had also testified that Baldwin was cooking when she left to pick up A.M. around 7:00 p.m. The mother explained that Baldwin was cooking when she arrived home with the child, but not before she left.
Baldwin testified that he was cooking when the mother arrived home with A.M. around 7:30 p.m. Baldwin testified that they were not able to sit down and eat because he called the police when the mother observed the marks. Baldwin testified that he did not finish cooking dinner until 9:15 p.m. because he had been interrupted by the arrival of the police and paramedics.
Dr. Matthew Seibel testified that he had examined two sets of photographs; one set was taken by the police on 26 October at about 9:00 p.m. and another set was taken at the hospital on 27 October at 9:00 p.m. Dr. Seibel testified that, judging by the photographs taken by the sheriff's department, the trauma occurred between two *244 and four hours before the photographs were taken. Dr. Seibel testified that the child could have been struck around 6:00 or 7:00 p.m. on 26 October. Dr. Seibel testified, however, that if more force had been applied, it was possible that the trauma could have occurred earlier. On redirect examination by DCF, Dr. Seibel testified that the injuries were inflicted with significant force.
Lasonja Roberts, a DCF representative, testified that she had been providing services for the mother because of hazardous conditions, inadequate shelter, inadequate food, and later for domestic violence.
During closing arguments, the trial court asked DCF if it considered the father non-offending, and DCF responded that it was not willing to take that position.
The trial court stated:
Based on the credibility of the testimony that has been presented todayI will state the most credible witnesses, by the way, was Ms. Jackson, Patricia Graham, outside, of course the records custodian and Dr. Seibel. Ithe Department is correct as far as the fact that I have got a child who has been abused. An abused child in and of itself is not sufficient for dependency unless the abuse has been caused by a parent. [The] definition of abuse does include failure to protect. And based on specific testimony of the mother, Mr. Baldwin, and specifically, the demeanor of the mother, I find the mother's testimony less than credible. I do not believe that the mother inflicted the injuries on this child. I do believe that she failed to protect the child. On that basis, the petition is dismissed against the father. There's a finding of dependency on the mother, and we go to dispo[sition].
At the disposition hearing the trial court granted permanent custody of A.M. to the father, with supervised visitation for the mother.
The mother contends that the dependency order is erroneous because state intervention must be based upon individualized proof, and there was no such proof in the instant case.
In reviewing an order adjudicating a child dependent, this court does not conduct a de novo review of the evidence or substitute its judgment for that of the trial court. Rather, this court will uphold the trial court's order `[i]f, upon the pleadings and evidence before the trial court, there is any theory or principle of law which could support the trial court's judgment....' In order to adjudicate a child dependent, the trial court must find by the preponderance of the evidence that the child has been abused, abandoned, or neglected or is at substantial risk of imminent abuse, abandonment, or neglect. Because the trial court is responsible for resolving disputes in the evidence and making findings of fact, the trial court's findings as to abuse, abandonment, or neglect will be sustained if they are supported by competent substantial evidence.
In re D.J.W. v. Department of Children and Families, 764 So.2d 825, 826 (Fla. 2d DCA 2000) (citations and footnote omitted); see also Ferry v. Abrams, 679 So.2d 80, 81 (Fla. 5th DCA 1996) ("it is the role of the finder of fact, whether a jury or a trial judge, to resolve conflicts in the evidence and to weigh the credibility of witnesses. Great deference is afforded the finder of fact because it has the first-hand opportunity to see and hear the witnesses testify").
In the instant case, there was conflicting testimony as to where A.M. was when she received the older bruise, the time at which she was transferred to the mother by the father, and the amount of *245 time Baldwin spent in the kitchen, and thus away from the child. There was evidence of previous violence on the part of the father and on the part of Baldwin. The photographs taken at the hospital indicated to Dr. Seibel that the trauma to the child could have occurred at a time when either the father or the mother was with the child. Further, DCF would not take the position that the father could not have abused A.M.
Nevertheless the record contains competent, substantial evidence to support the trial court's finding that the incident happened while A.M. was with the mother, and that A.M. was dependent. The mother and the DCF representative testified that DCF was involved with the mother because there was violence in her house. There was testimony that on a previous occasion, A.M. was returned with injuries after a visitation with the mother. The babysitter, whose testimony the court found credible, never saw any signs of abuse on A.M. during the lengthy period when the mother was not exercising visitation. In addition, in the trial court's view, the testimony regarding Baldwin's whereabouts while A.M. was at the mother's house was inconsistent and lacking in credibility. Finally, the mother testified that although the police told her to take A.M. to the hospital immediately, she waited until 3:00 p.m. the next day to take the child to the hospital.
The Dependency Order is AFFIRMED because it is supported by competent, substantial evidence.
SAWAYA and ORFINGER, R.B., J.J., concur.